**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Holly Martenson, ) | No. CV09-1314-PHX-NVW |
| Plaintiff, ) | **ORDER** |
| vs. ) | |
| RG Financing, et al., ) | |
| Defendants. ) | |

Before the Court is Plaintiff's Plea for Emergency Injunction (doc. # 9). Plaintiff's Plea for Emergency Injunction, Prehearing Memorandum on Application for Preliminary Injunction, and Sur-reply (doc. ## 9, 34, 50); Defendants' Prehearing Memorandum Regarding Injunction, Supplemental Memorandum Concerning Preliminary Injunction Hearing, and Reply Memorandum (doc. ## 32, 41, 46); and evidence and argument presented at the September 8, 2009 hearing have been considered. This order states the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(2).

Plaintiff's Motion for Leave to File Second Amended Complaint (doc. # 54) also is before the Court. Because none of the Defendants opposed the motion and none are likely to be prejudiced by the amendment, the motion will be granted.

**I.  Background**

In September 2006, based on a friend's recommendation, Martenson went to the California offices of Buy America Real Estate to inquire about refinancing her home loan.

1   On September 18, 2006, Martenson completed a Uniform Residential Loan Application to
2   refinance her Phoenix, Arizona, home (the "Property") with a thirty-year conventional
3   loan of $450,000 with a fixed interest rate of 8.5%. On the application she indicated that
4   the Property currently had a mortgage of $147,000, and the purpose of the refinance was
5   "Cash-Out/Other." Martenson also stated that the estimated value of her real property
6   was $2.2 million, comprised of $1.7 million for the Property and $500,000 for debt-free
7   property on St. Croix, U.S. Virgin Islands. She further described herself as self-employed
8   earning $12,500 per month and the owner of a business with a net worth of $500,000.
9       On November 29, 2006, Martenson executed an Adjustable Rate Note in the
10  amount of $450,000 with a beginning and minimum annual interest rate of 11.500%. The
11  Note identifies the Lender as JL Financing, LLC, and states that monthly payments are to
12  be made at P.O. Box 158, Verdugo City, CA 91406-0158. The Note states that the initial
13  monthly payment will be $4,312.50 and that the amount may change based on the unpaid
14  principal of the loan and the interest rate. It states that the interest rate may change on
15  January 1 of every year and will be 3.250% above the highest Prime Rate published in
16  The Wall Street Journal in effect 45 days before January 1. The interest rate to be
17  charged at the first change date would not exceed 14.500% and never increase or decrease
18  on any single change date by more than 3.000%. The interest rate would never be greater
19  than 21.500%. The Note also states, "I will pay interest only payments every month,"
20  and "My monthly payments will be applied to interest before principal." Every page of
21  the Note is either initialed or signed by Martenson.
22      The Note provides that monthly payments are to be made on the first day of each
23  month. If payment was not received by the end of ten calendar days after the due date,
24  Martenson would be required to promptly pay a late charge in the amount of 10.000% of
25  the overdue payment. The Note states, "If I do not pay the full amount of each monthly
26  payment on the date it is due, I will be in default." Upon default, the lender or its
27  assignee could notify Martenson that if she did not pay the overdue amount by a certain
28

date, she could be required to pay immediately the full amount of unpaid principal and all of the interest owed on that amount.

The Rider to the Note, also signed by Martenson, provides that upon default the interest rate would be increased by 5.000% above the contracted-for interest rate. The Rider imposes a prepayment charge on any prepayment within 12 months of the execution date, which also may be applied upon default any time during the first 7 years of the loan term, including when the lender or its assignee exercised its right to demand payment of the loan in full.

Also on November 29, 2006, Martenson executed a Deed of Trust to secure the $450,000 loan. The Deed of Trust identifies the beneficiary and lender as JL Financing, LLC, P.O. Box 158, Verdugo City, CA 91406-0158. It identifies the trustee as Gregg's Artistic Homes, Inc., P.O. Box 158, Verdugo City, CA 91406-0158. Paragraph 11 of the Deed of Trust states: "Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy." Paragraph 18 defines the "Borrower's Right to Reinstate," but the "1-4 Family Rider," signed by Martenson, states that "Borrower's Right to Reinstate," paragraph 18 of the Deed of Trust, is deleted.

Paragraph 21 of the Deed of Trust, titled "Acceleration; Remedies" provides in part:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument. . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. . . .
>
> If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of defauylt [*sic*] and of Lender's election to cause the Property to be sold. . . . After the time required by

> applicable law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale.

On November 29, 2006, Martenson also signed the Truth-in-Lending disclosure, acknowledging receiving and reading a copy of the disclosure, and the Notice of Right to Cancel, acknowledging that she had received two completed copies of the Notice of Right to Cancel. The Notice of Right to Cancel states:

> You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last: (1) the date of the transaction, which is Nov. 29-06 [initialed by Martenson]; or (2) the date you received your Truth-in-Lending disclosures; or (3) the date you received this notice of your right to cancel.

On November 29, 2006, Martenson also signed the Instructions to Escrow, which includes an itemized statement of fees and charges totaling $28,030, and the Itemization of Amount Finance/Prepaid Finance Charges, which shows the total prepaid finance charges as $32,108.06.

Martenson testified that she did not read any of the documents she signed on November 29, 2006.

The U.S. Department of Housing and Urban Development Settlement Statement and the Borrower Statement (Final) indicate that Martenson's loan closed on December 6, 2006. Addendum to HUD-1 (Additional Fees) identifies Buy America Real Estate as Martenson's mortgage broker. The Borrower Statement (Final) specifies all payments made for loan payoff, taxes, title charges, lender charges, and additional disbursements and the name of the payee for each.

By letter dated December 13, 2006, Anthony Rees-Thomas notified Martenson that she was to send monthly payments of $4,312.50 payable to RG Financing and addressed to RG Financing, P.O. Box 158, Verdugo City, CA 91406-0158. The letter states that coupons to be included with monthly payments were enclosed. The letter also states:

> It is important to note that there is a **late charge of ten percent (10%)** for any payment not **received** in our office by the 10th of the month. Monthly payments are due on the 1st day of each month.
>
> Also, if any payment is received late[,] that is, after the 10th of the month, or there is any other default on **your loan, then**, pursuant to the Rider to the Note which is attached to the back of your Note, **the prepayment penalty will remain in effect for the first seven years of the loan term.**

Martenson said that if she had received the letter from RG Financing, she would have disposed of it without reading it because she did not know what RG Financing was. Therefore, she called the title company and others to determine the amount of the monthly payment and to whom it was to be paid.

RG Financing's records show that Martenson made payments of $4,312.50 on February 5, 2007, March 2, 2007, and April 2, 2007. By letter dated May 24, 2007, Anthony Rees-Thomas notified Martenson that RG Financing still had not received Martenson's May 1st payment although she previously had been notified of the delinquency of her payment. The letter states:

> Therefore you have committed a default on your loan and pursuant to the Borrower's right to Prepay provisions of the Rider to the Note, your prepayment penalty shall stay in full force and effect for the first seven years of the loan term.
>
> The terms of your note also provide that at any time you are in default, interest accrues at the Default Rate. Pursuant to the Default Interest provision of the Rider to the Note, interest will begin accruing at the default rate of 16.50% as of June 1, 2007. To bring your loan current, RG Financing must receive **$4,743.75** on or before May 31, 2007. If, however, you fail to bring your loan current by May 31st, you will accrue interest at the default rate and your new monthly payment will be **$6,187.50** per month starting June 1, 2007 and will continue until you cure all defaults on your loan.

Martenson made no payments in May through October 2007 and knew she was behind on her payments. She believes she was in Europe during that time.

On August 28, 2007, a letter was sent to Martenson with the heading "Statement of Breach or Non-Performance." It states:

> The following described breach or non-performance of that certain Deed of Trust . . . has occurred:
>
> By reason of a breach of the contract for which said Deed of Trust is security, THE MONTHLY INSTALLMENT WHICH BECAME DUE

05/01/07 AND ALL SUBSEQUENT INSTALLMENTS, TOGETHER WITH LATE CHARGES, DELINQUENT TAXES, DELINQUENT INSURANCE PREMIUMS, IMPOUNDS, SENIOR LIENS WHICH ARE DELINQUENT OR BECOME DELINQUENT, ATTORNEY FEES AND COST AND ADVANCES.

The letter further explains that if Martenson disputed the validity of the debt, she had thirty days in which to make a written request for verification of the debt, and that JL Financing had elected to sell the Property at a trustee's sale. Enclosed with the letter was Martenson's payment history, which shows no payments were made in May through August 2007 and the payoff amount as of August 1, 2007, was $475,162.50.

On August 29, 2007, a Notice of Substitution of Trustee was recorded, appointing Orange Coast Title Company as the successor trustee under the Deed of Trust, replacing Gregg's Artistic Homes, Inc. On August 30, 2007, a Notice of Trustee's Sale was recorded. It states that the Property would be sold at public auction on November 29, 2007. It also identifies the present beneficiary as JL Financing, LLC, P.O. Box 158, Verdugo City, CA 91046-0158. On September 17, 2007, the Notice of Trustee's Sale was posted on the front door of Martenson's house and on the bulletin board in the Maricopa County Superior Court Building in Phoenix. It was published in the *Arizona Capital Times* on September 14, 2007, September 21, 2007, September 28, 2007, and October 5, 2007. The trustee's sale was postponed approximately every 15-30 days from November 29, 2007, until June 8, 2009, and each time a Certificate of Postponement was executed by the officer who publicly announced the postponement.

In November 2007 Martenson contacted Anthony Rees-Thomas of RG Financing regarding her default and the noticed trustee's sale. Subsequently, she made payments of $5,000 each on November 11, 2007, December 28, 2007, February 1, 2008, March 14, 2008, April 8, 2008, May 9, 2008, June 9, 2008, July 2, 2008, August 1, 2008, September 2, 2008, October 20, 2008, and November 19, 2008. No payments were made in December 2008 or January 2009.

By affidavit, Martenson's friend and business associate Trevor Manuel stated that he contacted Rees-Thomas on Martenson's behalf in January 2009 and communicated

- 6 -

with him by telephone and e-mail through mid-February 2009. Subsequently, Rees-Thomas postponed the sale scheduled for January 23, 2009, to February 4, 2009, then February 6, 2009, and then February 10, 2009. On February 9, 2009, Rees-Thomas told Manuel by e-mail that he had persuaded the RG Financing principals to postpone the sale until February 13, 2009, and that payment must be received by February 12, 2009. Manuel said that Rees-Thomas told him that if Martenson paid $25,000, the trustee's sale scheduled for February 13, 2009, "would be off."

On February 12, 2009, apparently in response to a telephone call from Martenson's associate B.J. Leet, Rees-Thomas e-mailed wiring instructions to Leet to remit $10,000 to RG Financing's bank. The e-mail states that, when he received notification of the wire, Rees-Thomas would postpone the sale until February 19, 2009. Leet forwarded the e-mail to Martenson a few minutes later. On February 13, 2009, by e-mail, Rees-Thomas told Martenson the sale had been postponed until February 19, 2009, and $15,000 must be received by February 18, 2009, or the sale would proceed.

By letter dated February 16, 2009, and unidentified method of delivery, Martenson told Rees-Thomas she believed she was only in arrears for the past six days in February. She told him that she had been paying $5,000 per month for over a year and it was her understanding that Rees-Thomas sent an email to Leet saying she had through Friday, February 20 to raise the funds. She also requested a payment history and a payoff amount. On February 17, 2009, Rees-Thomas responded to Martenson with a lengthy e-mail letter. He told her that she was behind in her payments by more than $75,000 of past due interest and late fees. He said he never told anyone the sale would be postponed to Monday, February 23, 2009, and that he had sent two e-mails to Leet stating the new sale date was February 19 and certified funds must be received by February 18. Rees-Thomas further stated:

> To be perfectly clear, IF we receive $15,000 of good funds by close of business on Wednesday, February 18, 2009, we will postpone the sale until March 12, 2009. In order to obtain an additional 30-day postponement beyond March 12th, we must receive $7,000 of good funds on or before Tuesday, March 10, 2009.

- 7 -

Rees-Thomas's February 17 letter also told Martenson the payoff amount on or before 5:00 p.m., February 18, 2009, was $566,431.65. If he received payment of $15,000 by close of business February 18 and the sale were postponed, she should let him know if she wished a formal payoff demand letter. If payment was not received and the sale conducted, there would no longer be any payoff amount.

Manuel said that Martenson informed him that $10,000 was paid to RG Financing on February 13, 2009, and the trustee's sale was postponed until February 19, 2009. Manuel told Rees-Thomas he could wire the additional $15,000 from Hong Kong and that a wire transfer could take up to 72 hours, but he could send Rees-Thomas a copy of the transfer from the bank. A day or two before February 19, 2009, Manuel called RG Financing to tell Rees-Thomas that he was ready to transfer the funds and to confirm that the sale would be postponed. He was informed that Rees-Thomas had been taken off the account, an additional payment of $25,000 was needed to postpone the sale, and if a payment of $15,000 were transferred, it would be returned. Manuel did not wire payment to RG Financing.

On February 19, 2009, Martenson filed a voluntary petition for bankruptcy protection.

Also on February 19, 2009, the trustee's sale was postponed to March 20, 2009. By letter dated March 13, 2009, RG Financing notified Martenson in order to reinstate she must pay RG Financing $90,033.56 by March 31, 2009. The reinstatement amount did not include interest accrued since March 1, 2009. The letter states that Martenson's payment history was enclosed and if she believed the payment history omitted payments she had made, she was to send RG Financing a copy of the cancelled check(s).

On May 20, 2009, the sale was postponed until June 5, 2009. On May 22, 2009, the Bankruptcy Court granted JL Financing relief from the automatic bankruptcy stay. On June 5, 2009, the trustee's sale was postponed to June 8, 2009.

On June 8, 2009, the Property was sold at a trustee's sale to JL Financing, the foreclosing beneficiary and lender identified on both the Note and Deed of Trust signed

by Martenson. The amount of the unpaid debt together with costs was $559,510.03. The amount paid was $499,000.00.

On June 18, 2009, Martenson filed a complaint, initiating this lawsuit, and a motion for preliminary injunction to stay eviction. On July 15, 2009, a hearing was held, and the Court issued a temporary restraining order against execution of the forcible detainer judgment.

On September 8, 2009, an evidentiary hearing regarding Martenson's application for preliminary injunction was held. Martenson testified, among other things, that she was out of the United States from May through October 2007. She also testified that, even when she is home, she often does not open her mail, and she would not have opened mail from Defendants during her bankruptcy proceedings because she thought the Bankruptcy Court would send her a payment schedule. Further, Martenson testified she stated on her loan application her monthly income was $12,500 because she believed that to be a fair estimate of her average income, and she was not concerned about making monthly payments of $4,312.50. She also was not concerned about the loan's interest rate because she anticipated paying it off quickly with some of her investments.

The matter was taken under advisement, subject to the parties needing to present further evidence. On October 12, 2009, the parties stipulated that no further evidentiary hearing was needed.

On November 12, 2009, Martenson filed her First Amended Complaint. On December 10, 2009, she filed a motion to amend or correct her First Amended Complaint. Defendants did not oppose the motion.

**II.     Analysis**

    **A.     Legal Standard**

To obtain preliminary injunctive relief, a plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008). "[T]he less certain

the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam).

### B. Likelihood of Success on the Merits

#### 1. Wrongful Foreclosure/Breach of Contract

Arizona courts strictly construe deeds of trust in favor of the borrower because the statutory deed of trust procedures "strip borrowers of many of the protections available under a mortgage," such as the right of redemption after sale guaranteed under a mortgage foreclosure. *Patton v. First Fed. Sav. & Loan Ass'n*, 118 Ariz. 473, 477, 578 P.2d 152, 156 (1978). "Therefore, lenders must strictly comply with the Deed of Trust statutes, and the statutes and Deeds of Trust must be strictly construed in favor of the borrower." *Id.* Further, "contracts will be strictly construed to avoid forfeitures." *Schaeffer v. Chapman*, 176 Ariz. 326, 329, 861 P.2d 611, 614 (1993). Martenson contends that Defendants violated terms of the Deed of Trust by failing to provide her notice of default, thirty days to cure the default, and notice before acceleration.

Paragraph 21 of the Deed of Trust defines a two-part notice procedure that requires, first, giving notice of default and opportunity to cure and, second, giving notice of intent to exercise the trustee's power of sale. *See Schaeffer*, 176 Ariz. at 328, 861 P.2d at 613 (construing nearly identical language as "plainly requir[ing] two distinct and consecutive notice periods"). Again, the first part is to provide the borrower notice of default and thirty days to cure the default:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument. . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) **a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured**; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. **The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.**

- 10 -

Defendants did not satisfy this requirement with their May 24, 2007, or August 28, 2007 letters. The May 24, 2007 letter gives notice to Martenson that she has committed a default and states the amount she must pay to cure the default, but it sets a deadline for cure only a week later—not the thirty-day minimum required by the Deed of Trust.

The second part of the notice procedure can be performed only after completing the first part and only if the borrower does not cure the default within thirty days. It requires the lender to notify the borrower that payment in full is required and the trustee's power of sale is invoked:

> If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. . . .
>
> If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of defauylt [*sic.*] and of Lender's election to cause the Property to be sold. . . . After the time required by applicable law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction. . . .

The August 28, 2007 letter to Martenson with the heading "Statement of Breach or Non-Performance" was apparently intended to commence the trustee's sale procedure, as it was dated only two days before the Notice of Trustee's Sale was recorded. Because Defendants had not provided the first part of the notice required by the Deed of Trust, the Notice of Trustee's Sale and the purported sale were invalid.

Defendants contend, however, that because Martenson did not obtain a preliminary injunction restraining the sale pursuant to Rule 65, she waived "all defenses and objections to the sale." A.R.S. § 33-811(C) provides in part:

> The trustor, its successors or assigns, and all persons to whom the trustee mails a notice of a sale under a trust deed pursuant to § 33-809 shall waive all defenses and objections to the sale not raised in an action that results in the issuance of a court order granting relief pursuant to rule 65, Arizona rules of civil procedure, entered before 5:00 p.m. Mountain standard time on the last business day before the scheduled date of the sale.

Martenson counters that subsection (C) must be construed to harmonize with subsection (B), which provides that a trustee's deed raises the *presumption* of compliance with

requirements of the deed of trust and the Deed of Trust statutes.  If the trustee's deed is executed and delivered after the trustee's sale and all defenses and objections to the sale are waived the day before the sale is conducted, there would be no need to presume compliance.  Martenson further contends that because subsection (B) provides that a trustee's deed constitutes conclusive evidence of meeting the requirements of the deed of trust and the Deed of Trust statutes only "in favor of purchasers or encumbrancers for value and without actual notice," subsection (C) should be construed as to waive defenses and objections only "in favor of purchasers or encumbrancers for value and without actual notice."

The parties have not cited, and the Court has not found, any citable cases interpreting A.R.S. § 33-811(C) after it was amended in May 2002 to include the entirely new subsections (C) and (D).  2002 Ariz. Legis. Serv. Ch. 259 (H.B. 2071) (West).  The original version of House Bill 2071 did not mention a trustor's waiver of defenses and objections, nor did any of the legislative committee minutes.  In fact, subsections (C) and (D) of § 33-811 were added to H.B. 2071 by a Senate floor amendment after the committee hearings were completed.  The parties have not presented any legislative history of the 2002 addition of subsection (C), and the Court's own investigation, admittedly preliminary, has yielded nothing directly explanatory of the new subsection.

Even read without regard to the entire statutory scheme, Defendants' interpretation of subsection (C) is improbable.  The Deed of Trust statutes must be strictly construed in favor of the borrower.  *Patton*, 118 Ariz. at 477, 578 P.2d at 156.  A.R.S. § 33-811(B) refers to "requirements of the deed of trust and this chapter relating to the exercise of the power of sale and the sale of the trust property, including recording, mailing, publishing and posting of notice of sale and the conduct of the sale."  The phrase "all defenses and objections to the sale" in subsection (C) may be construed as those defenses and objections relating to requirements such as "recording, mailing, publishing and posting of notice of sale and the conduct of the sale."  Further, waiver of "all defenses and

objections to the sale" should not defeat subsection (B)'s distinction between presumptive and conclusive evidence.

Moreover, Defendants appear to argue that subsection (C) absolves a beneficiary for selling the trust property even without a breach of the contract for which the property is security if the trustor fails to obtain an injunction stopping the trustee's sale. Completion of the sale would become a full substitute for actual breach of the contract, ending all inquiry there. Defendants would thus pack into the 2002 amendment of subsection (C) an implicit repeal of other express provisions of the statutory scheme and of the essential structure of the deed of trust system since its enactment three decades before. Trustors could no longer have post-sale adjudication that they were not in breach of the contract and that the sale was therefore substantively invalid. It would overturn the express holding of *Schaeffer v. Chapman*, 176 Ariz. 326, 329, 861 P.2d 611, 614 (1993), on materially identical facts that contractual rights to notice and cure must be satisfied before breach is ripe and sale of the collateral commenced. It is unlikely that this revolution was smuggled into a remote corner of a bill promoted as pro-consumer.

For now, the definitive construction of § 33-811(C) need not be decided. Defendants are plainly in breach of their notice and cure obligations under the deed of trust. For various reasons, it is unlikely that § 33-811(C) allows them to sell the deed of trust collateral anyway. Martenson has a likelihood of success on this claim, which would invalidate the trustee's sale.

### 2. RESPA Violations

The Real Estate Settlement Procedure Act ("RESPA") requires each loan servicer to notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person. 12 U.S.C. § 2605(b)(1). Martenson contends Defendants failed to give her the Notice of Transfer of Servicing Rights from JL Financing to RG Financing. However, JL Financing and RG Financing have the same address, which is plainly provided on both the Deed of Trust and the Note. It is unclear why, at first, Martenson did not know where to mail her monthly payment, but it appears that the address never changed.

1  Martenson does not allege that Defendants' failure to give her the Notice of Transfer of
2  Servicing Rights played any part in her default or that she would have opened the mail if they
3  had sent her a Notice of Transfer of Servicing.

4  RESPA also prohibits giving or accepting referral fees related to a real estate
5  settlement service and splitting charges made or received for the rendering of a real estate
6  settlement service other than for services actually performed. 12 U.S.C. § 2607. The
7  documents show origination fees were paid to Sunquest Mortgage and Investments, Inc., and
8  Buy America Real Estate, which may or may not violate RESPA, but Martenson has not
9  shown why the one-year statute of limitations should be equitably tolled when she received
10 the Borrower Statement, which itemized all fees and charges, by December 2006.

### 3.  Right to Rescission Under TILA

12 The purpose of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, is to
13 "assure a meaningful disclosure of credit terms so that the consumer will be able to compare
14 more readily the various credit terms available to him and avoid the uninformed use of credit,
15 and to protect the consumer against inaccurate and unfair credit billing and credit card
16 practices." 15 U.S.C. § 1601(a). Martenson appears to contend Defendants violated TILA
17 because Defendants were required to provide her with two copies of the Notice of Right to
18 Cancel, her personal file contained only one copy, and she believes she kept everything she
19 received at closing in that file. But she does not allege that receiving only one copy
20 prevented her from exercising her right to cancel or that she would have exercised the right
21 if she had received two copies.

22 Martenson also suggests that she was a victim of "bait and switch" because she
23 applied for a loan with more favorable terms than the one she executed. But she testified that
24 she knew that her beginning monthly payments would be $4,312.50 and she was not
25 concerned about paying that amount. Further, Martenson's testimony that $12,500 was her
26 fair estimate of her anticipated monthly income indicates that Defendants did not write in a
27 fictional income figure.

Finally, Martenson's time to rescind the loan transaction expired upon the sale of the Property. *See* 15 U.S.C. § 1635(f); A.R.S. § 33-811(C). Moreover, in order to exercise her right to rescind, Martenson must return all of the money she borrowed. *See* 15 U.S.C. § 1635(b). She does not assert that she will be able to do so.

**C.  The Public Interest and Balance of Hardships Weigh in Martenson's Favor.**

Neither Defendants nor Martenson briefed or produced evidence regarding the public interest and balance of hardships. It would be an irreparable hardship for Martenson to lose ownership and possession of the Property. Further, a preliminary injunction imposes little hardship on Defendants because they are more than secured by the Property, which is worth a multiple of Martenson's debt, even assuming the five point increase in interest and the six year extension of the prepayment penalty are valid liquidated damage terms upon default and not unenforceable penalties.

Martenson admits she knew how much she was required to pay and where and to whom payments were to be made, she had no objection to the monthly payment amount or the interest rates, and she made three timely payments and then went to Europe for six or seven months without making any payments or communicating with her loan servicer. Even if she had not been charged late fees and a default interest rate, she never made up the payments she missed. She testified she did not read the refinancing documents, was not aware that she signed an adjustable rate note, did not know what interest rates she would pay, and does not read much of the mail she receives. Martenson's reckless neglect of her contractual obligations gives her no equities. But Defendants too have been reckless in disregarding the minimal but explicit rights of the borrower in the Deed of Trust that they drafted and that precondition their power to forfeit her property. In this competition of brinkmanship, Defendants' is greater than Martenson's.

Thus, the public interest and balance of hardships weigh in Martenson's favor. She is very likely to succeed on the merits of at least one of her claims because Defendants did not comply with the two-part notice procedure required by the Deed of Trust. Therefore,

Martenson will be granted a preliminary injunction against eviction from the Property. She will be required to post a bond in the nominal amount of $100.00 because Defendants are more than fully secured by the Property. *See* Fed. R. Civ. P. 65(c).

IT IS THEREFORE ORDERED that Plaintiff's Plea for Emergency Injunction (doc. # 9) is granted. Plaintiff shall file a proposed form of injunction by January 29, 2010, and Defendants may file objections within seven days after Plaintiff's proposed form of injunction is filed. Issuance of a preliminary injunction will be conditional upon Plaintiff posting a bond of $100.00 pursuant to Fed. R. Civ. P. 65(c).

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to File Second Amended Complaint (doc. # 54) is granted. Plaintiff shall file her Second Amended Complaint.

DATED this 22nd day of January, 2010.

_____
Neil V. Wake
United States District Judge